RAPID RAILWAY CO. v. CITY OF MT. CLEMENS.

118    133
s76NW  318
e130  1  22

1. STREET RAILWAYS—SWITCHES—REMOVAL.

A street-railway company which is authorized to put in a "Y" at a given street, with the proviso that the company shall, if so ordered by the common council, remove the "Y" within 60 days after service upon it of a copy of an order of the common council directing it to do so, is bound by such agreement, and must remove the "Y" when ordered.

.2. SAME—CONSTRUCTION OF ORDINANCE.

An ordinance authorizing a street-railway company to put in "such turnouts, switches, and side tracks as may be deemed necessary," and providing that the whole length of road shall be deemed one route, with a fare not exceeding five cents, does not authorize the construction by such company of a "Y" switch to make a turning point for another street-railway company.

3. SAME—MUNICIPAL OFFICERS—COMMON COUNCIL.

The common council of a city is not bound to assent to the use by a street-railway company of a "Y" switch, which the company constructed between midnight Saturday and midnight Sunday, at the intersection of two of the principal business streets, for the purpose of turning its cars thereon, because the mayor and a member of the street committee had prior knowledge that such a switch was proposed.

Appeal from Macomb; Eldredge, J. Submitted April 26, 1898. Decided September 20, 1898.

Bill by the Rapid Railway Company to enjoin the city of Mt. Clemens and others from interfering with complainant in its operation of certain switches. From a decree dismissing the bill, complainant appeals. Affirmed.

*Byron R. Erskine* (*Charles M. Swift*, of counsel), for complainant.

*Seth W. Knight* (*Elliott G. Stevenson* and *Robert F. Eldredge*, of counsel), for defendants.

MOORE, J. This is a proceeding in chancery, where complainant seeks to have defendants enjoined from hindering or interfering with the operation of complainant's cars over the " Y " switch at the intersection of Cass avenue and South Gratiot streets, and the " Y " on Butler street, in the city of Mt. Clemens. The case was heard in open court. Complainant's bill was dismissed by the circuit judge. From his decision, complainant has appealed.

The complainant for some time has been operating an electric line of street railway from the City of Detroit to Mt. Clemens. It obtained a right of way over the highway occupied by the Detroit & Erin Plank-Road Company from that company. In 1894 an ordinance was granted authorizing complainant to construct a railway track—

"On, along, and through Gratiot street, in this city, from its intersection with the southerly city limits to the southerly line of Cass avenue, and upon such other streets and highways as may be hereafter agreed upon, * * * with all necessary and convenient * * * tracks, turnouts, side tracks, switches, bridges, and culverts."

Section 4 of said ordinance is as follows, viz. :

" That the authority granted by section 1 hereof shall be construed to be authority only to lay a single track on said street, together with such turnouts, side tracks, and switches as may be necessary for the successful operation of said road: *Provided*, however, that the location of said turnouts, switches, and side tracks shall be first approved by the street committee."

It will be noticed this franchise gave to the company no rights north of the southerly line of Cass avenue.

After the franchise was obtained, the company constructed its road. For a time its cars were operated from both ends. While this was done, the company did not have at Mt. Clemens a " Y " or turntable upon which it could turn its cars. Later its cars were equipped to run but one way, and it became desirable to have a " Y " upon which its cars could be turned. Application was made to

the common council for leave to put in a "Y" at Butler street, which application was granted subject to conditions which will hereafter be stated. The "Y" was put in, and it was the practice of the company to turn its cars at this place, and back them from there to near the south line of Cass avenue, a distance of about 4,000 feet.

At this time the Mt. Clemens & Lake Side Traction Company was operating an electric line of railway on Cass avenue, which passed near the terminal of the complainant. At the intersection of South Gratiot street and Cass avenue is one of the most important business centers of the city. Without consulting the common council, the complainant made an agreement with the president and manager of the Traction Company authorizing it to put in a "Y" at the intersection of South Gratiot street and Cass avenue, which would allow it to turn all its cars. The president and manager were not authorized by any vote of the directors or stockholders to make this contract, and, before the "Y" was put in, they were instructed by the directors not to allow it to be done. The testimony shows this instruction was not communicated to the complainant. It is claimed the mayor and one of the aldermen who was on the street committee had knowledge of the making of this contract. They both testified that, while they knew a connection was to be made between the tracks of the two companies, they did not know it was proposed to put in a "Y" for the purpose of using it as a turning place for the cars. The "Y" was put in between midnight Saturday night and midnight Sunday night. On the following Monday night, the common council forbade the use of this "Y," and it was not used except to a very limited degree. Later the Traction Company refused to allow it to be used at all. Negotiations were had between the two companies and the city looking to the settlement of the differences between them. These negotiations failed. The common council ordered the "Y" on Butler street taken up, as well as the one at the intersection of South Gratiot street and Cass avenue.

It is the claim of complainant that the "Y" at Butler street is necessary to the management of its road, and that it got some right to put it in by reason of its arrangement with the Detroit & Erin Plank-Road Company. Its application to the common council for leave to put this "Y" in is hardly consistent with this claim. As the Detroit & Erin Plank-Road Company had no rights whatever in Butler street, it is difficult to see how it could confer any rights upon the complainant. The authority to put in the "Y" at Butler street was granted with this proviso: "That said grantee, its successors or assigns, shall, if ordered to do so by the common council of the said city, remove said 'Y' switch within 60 days after service upon it of a copy of the order of the common council directing it to do so." The council ordered this "Y" taken up. The company refused to do what it had agreed to do as one of the conditions of obtaining the right to put in the "Y." It now seeks the aid of equity to prevent having done what it agreed to do. If the writ can be used for such a purpose, why may it not be used after the 30-years franchise granted to the company has expired? The "Y" was accepted with the condition imposed, just as the franchise was accepted with the limitation as to the length of time which it should exist. The railway company is bound by these conditions.

It is claimed, the city having conferred the right to construct the "Y" on Butler street, it cannot now deprive the company of the use of it; citing *Electric Ry. Co. of Grand Rapids* v. *Common Council of Grand Rapids*, 84 Mich. 257. We do not think that case applicable to this one. The city was under no obligation to confer the right to construct a "Y" on Butler street, and, when it conferred that right, it was competent for it to attach conditions which must be observed. Suppose the franchise to construct and operate the road had been limited to 20 years; could it be claimed the company could operate the road after the 20 years had expired, even though the city refused to grant them a franchise to do so? If not, how

can it be claimed it can operate this "Y" when the condition has arisen when the company agreed it should not be operated? The writ of injunction should not be used to aid the complainant in refusing to carry out its agreement. *Union Street R. Co.* v. *Saginaw Circuit Judge*, 113 Mich. 694.

It is claimed the "Y" at Cass avenue was convenient and necessary to the operation of the road of the Traction Company; that it was competent for that company to make the contract it did with the complainant, and therefore the "Y" should be allowed to remain. In our view of the case, it will not be necessary to express any opinion upon the question of whether the president and manager of the company were authorized by the directors and stockholders to make the contract which they made. Whatever rights the Traction Company had to the use of Cass avenue it obtained by *mesne* conveyances of the rights given by an ordinance to Le Duke and Bishop, and its amendments. The ordinance which conferred the right to Le Duke and Bishop to put in " such turnouts, switches, and side tracks as may be deemed necessary," etc., also provided, in section 7: " The whole length of the road authorized by this ordinance shall be deemed one route, and the rate of fare over said route shall not exceed five cents for each person over five years of age." This indicated very clearly that a connection with some other railway was not contemplated when turnouts and switches were referred to, but that the turnouts and switches needed by the railway to which the franchise was given were intended. This ordinance was amended so as to allow the use of a different kind of rails from those allowed to be used by the original ordinance, and had this proviso: " The manner of laying said tracks and rails and the alignment of same on the street to be subject to the inspection and approval of the common council and the city engineer." The common council and city engineer had no knowledge of the putting in of this work until after it was done, and never approved of it. Whatever may be the

effect of the contract so far as the two railway companies are concerned,— and upon that question we express no opinion,— the putting in of this " Y " was unauthorized by the city.

The contract made between the Rapid Railway Company and the Traction Company indicated very clearly the purpose of the Rapid Railway Company in making it. It reads:

"*Whereas*, the said Rapid Railway Company desires to put in a 'Y' at the intersection of Cass avenue and South Gratiot avenue, in the city of Mt. Clemens, for the purpose of connecting its line with the line of the Traction Company at this point, so that said Rapid Railway Company may turn its cars:  Now, therefore," etc.

The contract also provided:

"The said Rapid Railway Company is to have the privilege of using so much of the track of the said Traction Company as may be necessary to 'Y' its cars at this point, not to exceed a distance of 150 feet east and west from the line of said Rapid Railway Company, and to maintain and renew so much of said track as it may use, if it becomes necessary during the life of this agreement, including paving and repaving."

One cannot read this agreement without coming to the conclusion that the purpose of the Rapid Railway Company in making it was to allow it to turn its cars at this place.  The Rapid Railway Company was not authorized by its charter to go north of the southerly line of Cass avenue.  This " Y " was put in to make a turning point for the Rapid Railway Company.  It was not authorized by the franchise of the Traction Company.  Booth, St. Ry. Law, § 56.

Is it possible that the right to turn cars 47 feet long, and weighing 22 tons, at the intersection of the two principal business streets of a city like Mt. Clemens, can be acquired without obtaining the right to do so from the common council?  To state the proposition is to suggest the answer.  The common council was not consulted.

While the mayor and a member of the street committee had knowledge that it was proposed to connect the two tracks, they both swear they had no knowledge that it was proposed to put in a " Y " at this point, upon which the cars of the railway companies could be turned. And, even if they had knowledge of its purpose, they were not authorized to confer any authority to put it in. This " Y " was put in between midnight Saturday night and midnight Sunday night. The council at once forbade the use of the " Y," and it never has been used except surreptitiously, or by force, or upon one or two occasions by the permission of the council, it being expressly stated that its use did not give the company any permanent rights.

It is claimed some rights were obtained by virtue of some action of the common council taken in September, 1896. At this time a contract was entered into between the two companies, giving the Rapid Railway the right to run over the tracks of the Traction Company to the lower part of the city. The contract was not to be binding unless the city granted to the Traction Company an ordinance satisfactory to it, nor unless the franchise rights of the Rapid Railway Company were extended so as to permit it to make a loop around the Avery House Square, and other concessions acceptable to the city and the Rapid Railway Company. Afterwards an ordinance was adopted which conferred certain rights upon the Traction Company. It provided the ordinance should be of no effect unless accepted in writing by the Traction Company within 30 days from the passage of the ordinance. The time for its acceptance was afterwards extended, but the company declined to accept the ordinance, and never has accepted it. At the same time this ordinance was adopted, one was passed giving certain rights to the Rapid Railway Company. Among other rights conferred was the right to construct the loop around the Avery House Square, conditioned upon its being done within 90 days; the ordinance not to be binding unless accepted in writing within

a stated number of days thereafter. The time for the acceptance of this ordinance was extended at the same time the extension was given to the Traction Company, and for the same period. Upon the last day the Rapid Railway Company accepted the ordinance, but it did not build the loop around the Avery House Square within the 90 days, and it is not yet built. It is evident from the record that, when this contract was made and the two ordinances were passed, they were all part of one transaction, and were intended to settle the differences between the two railway companies, and to give the public service to the lower part of the city, and to secure the turning of the cars at the loop provided for in the ordinance. Unfortunately for all the parties, this object was not attained. The contention of the complainant that it is to receive the benefit of this proceeding as though the object of the city in making it had been attained, when it in fact accomplished nothing, is not tenable. The Traction Company did not accept the ordinance. The condition upon which the contract and the ordinance were to be operative failed, and no rights were acquired by reason of what was done.

The decree is affirmed, with costs.

GRANT, C. J., MONTGOMERY and LONG, JJ., concurred. HOOKER, J., did not sit.